# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

UNITED STATES OF AMERICA,

        **Plaintiff**

-vs-                                              Case No. 2:08-cr-88-FtM-29DNF

GURMERCINDO BELTRAN,

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO SUPPRESS EVIDENCE (Doc. No. 21)** |
| **FILED:** | **August 15, 2008** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

    The Defendant, Gurmercindo Beltran is requesting that the Court suppress evidence relating incidents that occurred on March 12, 2008, and May 13, 2008.  The Government filed a Response to Motion to Suppress Evidence (Doc. 26) on August 29, 2008.  On October 1, 2008,  the Defendant filed a Memorandum of Law in Support of Motion to Suppress (Doc. 35), and on October 2, 2008, the Government filed a Response to Defendant's Memorandum of Law In Support of the Motion to Suppress (Doc. 36).  The Defendant is charged in a three count Indictment. (Doc. 1).  In Counts One and Three, the Defendant is charged with possessing with intent to distribute a detectable amount of cocaine base, crack cocaine on two separate dates in violation of 21 U.S.C. §§841(a)(1) and

841(b)(1)(C).  The Defendant is charged in Count Two with possessing with intent to distribute a detectable amount of cocaine in violation of 21 U.S.C. §841(a)(1) and 841(b)(1)(c).  The Government argues that the officers acted lawfully and the evidence obtained should not be suppressed.  This matter was referred to this Court for a report and recommendation.  An evidentiary hearing was held on September 10, 2008.

### I.  Testimony and Evidence

The Government presented the testimony of Deputies Kowal, Partin, Marotta, Muhlhahn, Orr, and Freiberger who are all employed with the Collier County Sheriff's Office.  The Defendant presented no witnesses.

### A.  March 12, 2008 Incident

Deputy Daniel Kowal testified that on March 12, 2008, he received a call from dispatch of a burglary in progress at 124 Johnson Court. (Tr[1]. p. 5).   Dispatch informed Deputy Kowal that the owner of the residence was in the hospital, and that a neighbor called concerned that there was a burglary in progress at the residence. (Tr, p. 5).  Deputy Kowal proceeded to the residence which was a trailer and arrived there at 10:43 a.m.  (Tr. p. 5, 12). Other officers appeared on the scene. (Tr. p. 5).  The officers observed the house until the Defendant exited the trailer.  (Tr. p. 5-6).  Deputy Kowal detained the Defendant outside of the trailer based upon the call that a burglary was in progress.  (Tr. p. 6). For the safety of the officers, Deputy Kowal asked the Defendant if he lived in the residence and he responded no, and then Deputy Kowal asked if there were other people in the house, and the Defendant responded there were.  (Tr. p. 6). Deputy Kowal took the Defendant to Deputy Marotta.

---

[1]  "Tr." refers to the Transcript (Doc. 32) of the September 10, 2008 hearing.

(Tr. p. 7).  Deputy Kowal could hear people moving around and a commotion in the house.  (Tr. p. 7).

Deputy Marotta also responded to the dispatch call that a burglary was in progress at 124 Johnson Court.  (Tr. p. 41-42).  When Deputy Marotta arrived at the scene, he saw subjects in front of or to the side of the trailer.  (Tr. p. 42).  Deputy Culnan asked him to detain one of the subjects as a possible suspect in the burglary.  (Tr. p. 7, 42)  He placed handcuffs on this person and searched him quickly.  (Tr. p. 42).  The suspect was later identified as the Defendant. (Tr. p. 43)  Deputy Marotta asked the Defendant what was in his front pocket and he told him it was car keys.  (Tr. p. 43).  The Defendant appeared to understand English and responded in English.  (Tr. p. 43).   Deputy Marotta removed the keys from the Defendant's pocket and placed them on the ground. (Tr. p. 44, 55).  He asked the Defendant whose car was in the carport, and the Defendant stated it was his sister's car. (Tr. p. 44).  Deputy Marotta had not given the Defendant his *Miranda* rights.  (Tr. p. 48).

Deputy Kowal and Corporal Culnan  proceeded to opposite corners of the house.  (Tr. p. 7). Deputy Kowal yelled and identified himself as a law enforcement officer but the people in the trailer did not come out. (Tr. p. 7).   A side door of the trailer was ajar, and Deputy Kowal could see down the hallway, and he saw someone in the bathroom of the trailer.  (Tr. p. 8). He told that person to come out, but the person refused.  (Tr. p. 8).   Deputy Kowal entered the trailer and saw Nora Brooks pushing items onto the floor in the bathroom. (Tr. p. 8).  He grabbed her arm and told her to exit the house.  (Tr. p. 8).  Corporal Culnan was standing outside of the door and secured Brooks.  (Tr. p. 8). Deputy Kowal saw a purse on the floor where Brooks had been, a syringe with what appeared to be fresh blood on it, and a spoon with white powder on it.  (Tr. p. 8, 9).  He bagged these items in an evidence bag.  (Tr. p. 8).  He advised Brooks that he was placing her under arrest for possession of

illegal drug paraphernalia and for possession of cocaine. (Tr. p. 9). The substance on the spoon field tested positive for cocaine.  (Tr. p. 9).

Brooks was taken to Deputy Marotta's patrol car and given her *Miranda* rights which she understood. (Tr. p. 9, 46). When Deputy Kowal asked her why she did not exit the residence, she responded that she was scared, and did not know what to do with the paraphernalia. (Tr. p. 10).  She told him that she was given cocaine by Mr. Beltran and had just used the cocaine prior to his arrival. (Tr. p. 10, 46, 55).  She was crying and expressing concern because she was on bond, and was afraid that she would not be released if arrested.  (Tr. p. 20-21).  She also told him that she had been picked up by Mr. Beltran in the black vehicle in the carport and there was cocaine in the black vehicle.  (Tr. p. 10-11, 27).  Deputy Kowal passed this information on to Deputy Partin. (Tr. p. 11). Deputy Kowal concentrated on gathering evidence and separating it into bags due to some of it containing hazardous waste. (Tr. p. 11).

Deputy Marotta took control of Brooks and transported her to jail. (Tr. p. 44, 45). The patrol car was equipped with video and audio recording equipment, however it appears that the audio equipment was not turned on until Brooks was being transported. (Tr. p. 22, 44). Brooks was coherent but upset.  (Tr. p. 45). She understood what Deputy Marotta said to her and he understood what she said to him. (Tr. p. 45). He talked to her about cooperating, and did tell her that they were going to the David Lawrence Center when actually they were going to jail. (Tr. p. 48, 53-54).   Brooks expressed concern for her children and said that she was going to kill herself.  (Tr. p. 54). She was rambling, upset and crying. (Tr. p. 55).  When she made statements, she referred to the Defendant as "Chino".  (Tr. p. 23). From a prior encounter with the Defendant, Deputy Kowal testified that he knew that "Chino" was the Defendant's nickname. (Tr. p. 24-25).  Deputy Kowal asked Brooks if she

-4-

referred to Beltran as "Chino," and she said yes.  (Tr. p. 25-26).  There were two females other than

Brooks, and one other male other than the Defendant in the residence who exited the residence and

were handcuffed outside.  (Tr. p. 12, 23, 24).  Beltran was handcuffed in the yard the entire time.  (Tr.

p. 26-27).

Deputy Tod Partin responded to the request for assistance from Deputy Kowal regarding a

possible burglary.  (Tr. p. 30). After he arrived at the scene at approximately 11:34 a.m., he watched

the subjects in the yard. (Tr. p. 31, 36). Deputy Kowal told him that Brooks had said that she obtained

narcotics from Beltran.  (Tr. p. 31). He asked the Defendant if the black vehicle was his. (Tr. p. 31).

The Defendant responded that the vehicle was his sister's car. (Tr. p. 31).  Deputy Partin asked if the

Defendant had keys to the vehicle and he said he did. (Tr. p. 32).  The Defendant was handcuffed

during this conversation.  (Tr. p. 32).  The Defendant understood Deputy Partin and responded in

English. (Tr. p. 32). A narcotics dog was called to the scene. (Tr. p. 31).

Deputy Muhlhahn was dispatched to the residence when dispatch called for a K-9 unit. (Tr. p.

58). Deputy Dan Muhlhahn is a trained K-9 handler. (Tr. p. 57).  He had over 400 hours of training

as a handler with his first dog and over 380 hours of training with the dog used in the instant case. (Tr.

p. 57).  The dog is trained as a single purpose narcotics dog. (Tr. p. 58).  Deputy Muhlhahn  has used

this narcotics dog thirty to forty times. (Tr. p. 60).   The narcotics dog has alerted once or twice

without illegal drugs begin found. (Tr. p. 60).  Deputy Muhlhahn attempted to determine why the

narcotics dog alerted, in those one or two cases, and one possible explanation is that there was a

residual odor of illegal drugs present.  (Tr. p. 60).

Deputy Muhlhahn arrived at the scene at approximately 11:49 a.m.  (Tr. p. 61).  Deputy

Muhlhahn asked the officers on the scene what was to be examined, and was told a vehicle.  (Tr. p.

59).  The narcotics dog was deployed to the vehicle.  (Tr. p. 59).  The narcotics dog's alert is that he will sit down if detects the odor of narcotics. (T. p. 59).  The narcotics dog alerted on the front passenger side of the black vehicle. (Tr. p. 60). Deputy Muhlhahn told the other officers that the narcotics dog alerted.  (Tr. p. 60).

Deputy Partin conducted a search of the interior of the vehicle finding the vehicle was unlocked. (Tr. p. 33).  No contraband was found in this search, and when Deputy Partin attempted to open the glove box, he found it was locked. (Tr. p. 33).  Based upon Deputy Partin's earlier conversation with the Defendant that he had keys to the black vehicle, Deputy Partin asked the Defendant for the keys. (Tr. p. 33).  The Defendant said he did not have them. (Tr. p. 33).  Deputy Partin patted down the Defendant and felt keys in the Defendant's pocket. (Tr. p. 33-34). Deputy Partin removed the keys from the Defendant's pocket.  (Tr. p. 34). The keys unlocked the glove box, and Deputy Partin found an opaque green pill canister with pieces of an off-white substance, a white powder, and two pills. (Tr. p. 34).   Field tests were conducted and the off-white substance was found to be crack cocaine, the white powder was cocaine, and the pills were Oxycodone. (Tr. p. 35).

Deputy Kowal testified that when he went inside the residence, a suspect, Michael Murphy was sleeping or pretending to be sleeping in a bedroom. (Tr. p. 13).  Murphy did not identify himself as a tenant when the officers first encountered him. (Tr. p. 16).  Approximately forty-five (45) minutes after Beltran was detained, Deputy Kowal testified that it was determined that a burglary was not in progress, however, Beltran continued to be detained as he was the subject of a narcotics investigation. (Tr. p. 19).

### B.  May 13, 2008 Incident

Deputy Thomas Orr is on the Special Enforcement Team which concentrates on crimes committed in certain areas. (Tr. p. 64).  At approximately 4:00 p.m. on May 13, 2008, Deputy Orr was driving his vehicle when he observed a Hispanic male, the Defendant, walking northbound. (Tr. p. 64-65).  This male kept looking around like he was looking for someone which caused Deputy Orr to become suspicious. (Tr. p. 65).  The area the Defendant was in was known for narcotics trafficking. (Tr. p. 68, 80). Deputy Orr existed his vehicle. (Tr. p. 65).  He identified himself as being with the Sheriff's Office, and asked the Defendant if he could speak to him. (Tr. p. 65, 66).  The Defendant pulled a clear bag with a white substance out of his pocket and threw it over a fence and into a yard. (Tr. p. 65).   Deputy Orr suspected the bag contained crack cocaine. (Tr. p. 66).   Deputy Orr approached the Defendant and detained him.  (Tr. p. 66).

On May 13, 2008, Deputy Scott Freiberger was patrolling the same area as Deputy Orr, and Deputy Freiberger saw Deputy Orr come into contact with an individual later identified as the Defendant. (Tr. p. 79-80).  Deputy Freiberger saw the Defendant throw something into an adjacent yard.  (Tr. p. 80-81).  He helped Deputy Orr detain the Defendant and then went and retrieved the baggie. (Tr. p. 81).  The baggie was 10 feet from the Defendant in the backyard of a residence. (Tr. p. 82).  The yard was well-maintained and there were no other items in the yard. (Tr. p. 82).  The baggie contained crack cocaine. (Tr. p. 85).

### II.  Analysis

The Defendant asserts that his detention on March 12, 2008  was unlawful, that the statements obtained from him regarding the vehicle and the keys should be suppressed as they were taken without

*Miranda* rights being given, the seizure of the keys should be suppressed, and that there was no probable cause for the search of the vehicle.  The Defendant contends that the May 13, 2008 detention was without reasonable suspicion and without probable cause, that the discarded baggie containing cocaine base was the product of the illegal detention and that the search of the Defendant and his subsequent arrest were unlawful.

### A.  March 12, 2008 Incident

### 1.  Lawfulness of Detention

The Defendant contends that his detention was unlawful based upon the lack of reasonable suspicion and probable cause that he had engaged in any lawful activity.  The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV.  An officer may briefly detain an individual if the officer has a reasonable and articulable suspicion that the person has committed or is about to commit a crime.  *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).  "In *Terry* the Supreme Court 'carved out a narrow exception to the [Fourth Amendment] probable cause requirement, allowing police to detain a suspect based on reasonable suspicion for the purpose of an investigative detention.'" *United States v. Williams*, 185 Fed.Appx. 866, 868-69 (11th Cir. 2006) (quoting *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)).  The Court must consider the totality of the circumstances in determining whether an officer had a "'particularized and objective basis for suspecting legal wrongdoing.'" *U.S. v. Medlock*, 146 Fed.Appx. 470, 472 (11th Cir. 2005) (quoting *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

An officer is permitted to handcuff a suspect during an investigatory stop when it is reasonable under the circumstances to protect the officers or the public. *United States v. Williams*, 185 Fed.Appx. at 869. To determine if the *Terry* stop was reasonable, courts consider the following four factors: "(1) the purpose of the detention; (2) the diligence of the police in conducting the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention." *Id*.

The Defendant asserts that the original purpose of the detention was the burglary in progress dispatch and that purpose dissipated when the officers determined that Murphy was a resident of the trailer. The Defendant argues that he should have been released at that point. When the officers arrived at the residence, they had received information from a neighbor that there was a burglary in progress. The Defendant exited the residence, and the officers had reasonable suspicion that he was involved in the possible burglary. The Defendant told the officers that there were other people in the residence. For the protection of the officers as well as the other people at the location, the officers handcuffed the Defendant while they investigated the situation. Because the owner of the residence was in the hospital, it took time for the officers to verify that the residence was not being burglarized. Even if one of the occupants, Murphy told the officers that he was a tenant, the officers still had to verify this statement.

While the officers were verifying that no burglary was occurring, Deputy Kowal had uncovered evidence of illegal narcotics. Brooks provided information that she obtained cocaine from the Defendant and that there was more cocaine in the vehicle. The officers had reasonable suspicion that the people present including the Defendant were involved in a crime involving narcotics. The officers began immediately investigating the narcotics crime by contacting a K-9 unit to meet them at the residence. The narcotics dog alerted to the presence of an odor of illegal drugs in the vehicle. The

Defendant stated that the vehicle was owned by his sister and he had possession of the keys to the vehicle. The Court determines that purpose of the detention to first investigate the burglary and then to investigate a narcotics crime was lawful.

The police officers diligently investigated the burglary and the illegal narcotics crimes. The officers investigated the crimes for a little over an hour. The Defendant asserts that once Murphy stated he was a tenant, that the Defendant should have been released. The officers had to verify the statements made by Murphy that he was indeed a tenant of the residence. Further, the officers searched the residence and spoke to the suspects at the residence while attempting to contact the owner of the residence. The officers also diligently investigated the illegal narcotics by contacting the K-9 unit. The Court determines that the officers diligently investigated the possible crimes occurring at the residence.

The Defendant was detained by being handcuffed and was required to remain in the yard of the residence. Handcuffing an individual is a serious intrusion. In this case, however, there were a number of suspects at the residence and any or all of them could have been involved in the burglary. Further, officers found narcotics paraphernalia in the residence, and had a statement from Brooks that there was more illegal drugs in the vehicle. To investigate this claim, the officers contacted the K-9 unit. To maintain a safe environment for the officers as well as the suspects, the officers needed to handcuff all of the suspects. The Court finds that scope of intrusiveness was reasonable and lawful.

To determine if the duration of the stop was too long, the Court must consider whether the officers pursued a method of investigation which would dispel their suspicions quickly and with a minimum of interference. *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) *cert. denied* 531 U.S. 951 (2000). The officers detained the Defendant at the residence to investigate the possible burglary and the possible narcotics crime. They were diligent in their investigation and the Court

determines that the length of detention of a little over an hour was not unreasonable nor unlawful. The Court determines that the detention of the Defendant was lawful.

### 2.  Statements Relating to Vehicle and Key

The Defendant argues that he was not given his *Miranda* rights and his statements given during an illegal detention are inadmissible even if they were voluntarily given. There is no dispute that the Defendant was being detained by the officers at the residence and that no *Miranda* warnings were given. Officers are not required generally to give *Miranda* warnings during an ordinary temporary detention of a person. *United States v. Viezca*, 555 F.Supp. 2d 1254, 1263 (M.D. Ala. 2008) (citing *Pennsylvania v. Bruder*, 488 U.S. 9, 10 (1988)). If the detention was illegal, then the statements given by the defendant would be inadmissible. *See, Florida v. Royer*, 460 U.S. 491, 501 (1983). In the instant case, the Court has determined that the detention was not illegal.

An officer asked the Defendant if he owned the black vehicle and if he had keys to the vehicle. General routine inquires into the ownership of the vehicle are not considered custodial interrogations. *United States v. Jones*, 543 F.2d 1171,1173 (11th Cir. 1976), and *Jernigan v. United States*, 2006 WL 2613635, *5 (M.D. Ga. 2006). Therefore, the questions by the officers as to the keys and the ownership of the vehicle should not be suppressed.

Deputy Marotta did  an initial pat down of the Defendant and asked him what was in his front pocket. The Defendant stated it was keys, and Deputy Marotta testified that he removed the keys from the Defendant's pocket and placed them on the ground. Later, after the narcotics dog alerted at the front passenger door of the vehicle, Deputy Partin attempted to open the glove box and found that it was locked. He asked the Defendant for the keys to the car and the Defendant indicated he did not

have them.   Deputy Partin knew that earlier the Defendant did have the keys, and he patted down the Defendant and felt keys in the Defendant's pocket.   He removed them and used them to unlock the glove box.   There was no testimony as to how the keys were moved from the ground to the Defendant's pocket after Deputy Marotta had placed them on the ground.

An officer is permitted to pat down an individual to conduct a limited search for weapons when the officer has reason to believe that the individual is armed and dangerous.  *United States v. Salter*, 255 Fed.Appx. 355 (11th Cir. 2007) (citing *Terry*, 392 U.S. at 27)).  "'Once an officer has legitimately stopped an individual, the officer can frisk the individual so long as "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."'"  *Id*., (quoting *United States v. Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002)(quoting *Terry*, 392 U.S. at 27)).

In the instant case, the officers had a reasonable suspicion that there was a burglary in progress. The officers' belief was a reasonable belief that the individuals might have weapons and for their safety the officers patted down the Defendant to determine if he had a weapon on his person. Therefore, the pat down of the Defendant was lawful.

The Defendant argues that the seizure of the keys pursuant to the pat down was unlawful citing to *United States v. Holmes*, 505 F.3d 1288 (D. D.C. 2007).  In *Holmes*, officers observed Holmes in an alley with an unidentified woman.  *Id*. at 1290.  Holmes ran away from the officers. *Id*.  The couple was in an area known for illegal narcotics and prostitution. *Id*.  The officers chased Holmes. *Id*.  When they caught him, they patted him down and found a package of cigarette rolling papers in his front pocket, a set of keys, and a wallet.  *Id*.  An officer removed the keys and wallet, and handcuffed Holmes.  *Id*.  The officers questioned Holmes about how he got to this area, and he answered that he

-12-

had taken a train to get there, then answered that a friend had dropped him off. *Id*. at 1291. The officers did not believe him, and kept questioning him. *Id*. Finally Holmes admitted that he drove himself to the location. *Id*. The officers asked him where his car was parked and eventually he told them that it was parked around the corner. *Id*. Taking the keys, an officer walked the streets using the remote entry to identify Homes' car. *Id*. The officers asked Holmes to sign a consent to search the car stating that they were worried that there were narcotics in the car. *Id*. Holmes moved to suppress the removal of his keys. *Id*. The Court found that the officers had exceeded the permissible scope of a pat down search when they seized Holmes' keys as the keys were neither a weapon nor contraband. *Id*. at 1292 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The Court held that a pat down search pursuant to a *Terry* stop was strictly limited to what is necessary to discover weapons and if an officer discovers contraband, he does not have to ignore it. *Id*. There was no claim in *Holmes* that the keys constituted a weapon nor contraband. *Id*. The Court continued its analysis by considering whether the Defendant made a *prima facie* showing of a causal connection between the taking of the keys, and the evidence that he was seeking to suppress. *Id*. (citing *United States v. Crews*, 445 U.S. 463, 471 (1980). The Court found that "Holmes met his burden of showing that, but for the illegal seizure of the keys, the officers likely would not have discovered the gun and ammunition in his car." *Id*. Therefore, the Court suppressed the keys and the evidence seized from the vehicle. *Id*.

In the instant case, Deputy Marotta testified that he seized the keys from the Defendant and place them on the ground. Pursuant to *Terry*, Deputy Marotta is permitted to conduct a pat down search of the Defendant to check for weapons. Deputy Marotta did not testify that he believed the keys to be either a weapon or contraband, therefore, his seizure of the keys at that time exceeded the scope of the *Terry* pat down. Next, the Defendant must show a causal connection between this seizure

of the keys and the ultimate discovery of the contraband in the vehicle. *United States v. Crews*, 445 U.S. 463, 471 (1980). The Defendant has not shown that but for the illegal seizure of the keys, the contraband in the vehicle would not have been discovered. After Deputy Marotta seized the keys, the keys were not used to discover the contraband until after the narcotics dog alerted. After the alert, the officers had probable cause[2] to believe that contraband was located in the vehicle. Deputy Partin testified that he obtained the keys from the Defendant's pocket and opened the locked glove box with them. Once there is probable cause to search a vehicle, then every part of the vehicle that may conceal illegal narcotics is permitted to be searched. *United States v. Mathis*, 239 Fed. Appx. 513, 515 (11th Cir. 2007) (citing *United States v. Ross*, 456 U.S. 798, 825 (1982)). Deputy Partin was permitted to search the glove box with or without the key. The Court finds that the seizure of the key should not be suppressed.

### 3. Probable Cause to Search Vehicle

The Defendant asserts for the search of the car to be valid, the Government must establish that the narcotic dog's alert rises to the level of probable cause. "Probable cause exists to search a car without a warrant where a drug dog has alerted to drugs in the car." *United States v. $175,722.77*, 2007 WL 1339853, *2 (11th Cir. 2007) (citing *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)). In the instant case, the officers were given information by Brooks that there were illegal drugs in the vehicle. The officers contacted the K-9 unit and the narcotics dog alerted to the right passenger seam of the car. The officers had probable cause to search the vehicle without a warrant. Deputy Muhlhahn testified that this narcotics dog had been used thirty to forty times and he recalled two times when the dog alerted but no narcotics were found. Deputy Muhlhahn testified that the dog may have

---

[2] The issue of probable cause is discussed more fully in the next section.

alerted on the residual odor of narcotics but he could not confirm this theory.  Deputy Muhlhahn explained the two alerts where illegal drugs were not found sufficiently for the Court to rely on the narcotics dog's alert.  *See, United States v. McNicoll*, 2008 WL 4087746, n. 3 (S.D. Ga. 2008) (citing *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007)).  The Court finds that based upon the statement of Brooks confirmed by the narcotics dog's alert on the vehicle, probable cause existed to search the vehicle, and the items seized should not be suppressed.


### B.  May 13, 2008 Incident

The Defendant argues that he was detained unlawfully on May 13, 2008.  Officer Orr testified that the Defendant was walking down the street looking around suspiciously.  Officer Orr identified himself and said to the Defendant that he would like to talk to him.  The Defendant then threw a clear baggie with a white substance into a backyard.  "'[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen.'"  *Illinois v. Lidster*, 540 U.S. 419, 425 (2004) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)).  There was no evidence presented that Deputy Orr or Deputy Freiberger displayed their weapons or made a show of force or authority.  The initial contact with the Defendant by Deputy Orr was not a detention or a seizure within the meaning of the Fourth Amendment, and therefore, the evidence seized should not be suppressed.

-15-

## II.  Conclusion

The Court determines that the deputies acted lawfully during the March 12, 2008 and May 13, 2008 incidents and that the statements and evidence from these incidents should not be suppressed, and the Court respectfully recommends that the Motion to Suppress Evidence (Doc. 21) be denied.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this ___8th___ day of October, 2008.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE


Copies: All Parties of Record